The next case on the calendar is United States v. Ross. Good morning, Your Honors. My name is Stephen Lance Cimino. I represent Terry Ross. Terry Ross was charged as a member of a conspiracy to manufacture an excessive 50 grams of methamphetamine. And the issue I want to discuss this morning is whether or not the government produced sufficient evidence to prove the production of more than 50 grams of meth. And I'd like to read from the government's brief at page 32, if I may. It says, furthermore, even assuming arguendo that Peck, the person who testified, provided an opinion, he was testifying as a lay witness. As required by federal rules of evidence 701, Peck's testimony concerning yield rates was rationally based on his perceptions and was helpful to the jury's determination of a fact and issue. He did not base his yield rate conclusions on facts or data that would otherwise be admissible, as experts are permitted to do under federal rules of evidence, see federal rules of evidence 703. Nor did Peck rely on scientific or technical knowledge concerning the nature of the chemical reactions involved or the mechanism by which certain variables affected the yield. This court has explained that a witness's specialized knowledge or the fact that he was chosen to carry out an investigation because of this knowledge does not render his testimony expert as long as it was based on his investigation and reflected his investigatory findings and conclusions and was not rooted exclusively in his expertise. What other conclusion could we come to after Mr. Peck had testified at the conclusion of all of the government's evidence in its case in chief that he was their person who was going to demonstrate number one? Excuse me, there was no objection to this testimony, was there? No, there was no objection. And you're not, I didn't think that there was an argument in the brief explicitly that this was inadmissible testimony. The issue is whether, assuming this testimony is admitted, does it, combined with other evidence, support a jury's verdict as to the amount? Is that not the argument? That is the argument, Your Honor, that whether or not this is sufficient evidence to prove the production if we look at everything that the government put forth in its... And what this gentleman is saying is I am somebody who has made methamphetamine out of pseudoephedrine. Here's how I do it. And when I do it, I use this many pills and I get this much meth. That's what he's saying based on his actual experience of what he did and what he saw in his experience. Right? Yes, Judge. Okay. And the jury is then, according to the government, supposed to say, well, if this fellow gets X amount of methamphetamine from Y amount of pseudoephedrine, and I know that the conspirators in this case had Y amount of pseudoephedrine, then I infer that the amount of methamphetamine that they made was X, just like this fellow did. That's the logic. Exactly, Judge. And if we back it up, how do we know, or what evidence was there, number one, that the Coleman method even produces methamphetamine, and, number two, how much methamphetamine it does produce? I mean, clearly he has made himself an expert at rendering what I submit as scientific opinion. Well, he makes meth, he testified, using the shaking method and lantern fuel, right? Yes, Your Honor, the Coleman method. And the conspiracy involved also the shaking method and lantern fuel, right? Yes. I'm sorry. No, go ahead. What were you going to say? I mean, there's two issues. Number one, the issue is the conspiracy that they were going to do this, they were going to put this all together to try and make some meth, and the other count is whether or not they actually produced it. And it's the actual production here that I'm focusing on, that what other evidence and what other conclusion can be drawn, the fact that he has made himself a scientist who says you take this amount of stuff and it produces this amount of meth. Well, you have a reasonable argument that so he got about 50% yield. I expect if you shake it a little bit differently or use the fuel a little bit differently, maybe your yield rate would vary from person to person, and that could be an issue, I suppose. But the problem is this conspiracy seems to have involved over 546 grams that the co-conspirators purchased. The two defendants here, 167 grams. So if you add all that together, you'd have to go down to a yield rate of about 9% to say there's not at least 50 grams involved here. So it's hard for me to understand why the evidence isn't sufficient that 50 grams was involved. I guess I'll just go back to the thing that I said, you know, before, was how do we even know that the Coleman method produces methamphetamine? What evidence is there of that? Is it simply because Timothy Peck says it does? And assuming arguendo that it does, how do we know how much it does produce? And I think because we don't have any answers to those questions, the case becomes wholly circumstantial. And I've addressed the circumstantial evidence charge and how I felt it was insufficient, and I direct the Court to page 26 of my brief because I see I'm running out of time. Was there a challenge to the fact that somehow this wasn't methamphetamine? We challenged it in our Rule 29. I don't know what it was. I mean, our position was. I'm not talking about what you know. I'm talking about what the understanding was that was conveyed to the jury at trial and what was debated, you know, what was the issue that was raised in terms of what the substance was. What was conveyed to the jury? My assumption is that this really was an issue. This was a methamphetamine case, and nobody really questioned that what was going on here was methamphetamine. That's what all the testimony was about, and that's what the objectives were, the part of the defendants and the cooperators talked about it and so forth. So it really wasn't a question of not knowing what it was. It isn't a question that they put this together, maybe that their intent was to produce it, but the question is did they in fact produce it? What evidence was there that in fact this method produces methamphetamine and how much methamphetamine it produces? And it's on that basis that we brought our objection that you can't rely on Timothy Peck. I think he violates the very spirit. I could see you arguing quantity, and that's the way you started out, but you're now challenging the whole case on the basis of the fact that they must have been producing something else, cotton candy. I don't know what they were producing, Judge. I suppose they— I hear you. But there were these cooperators who talked about we made methamphetamine, we sold it as methamphetamine. Nobody came and shot us saying that what they got wasn't methamphetamine. I mean, what you would be saying is that there can be no conviction for at least a substantive offense as opposed to a conspiracy case unless there is a seizure followed by a chemical analysis of that product. No, Your Honor. I'm not suggesting that. I think if the government had produced a witness, a forensic person who may have talked about this Coleman method and that methamphetamine can be produced under these circumstances, then I think you've put the entire nexus out there. But what about the other co-conspirators? That's what I'm troubled by. If you had a bunch of people who said, you know, we were dealing in heroin for years out on the streets of Harlem, and we would buy the heroin here and sell the heroin there. We had lots of customers. I use it myself. Why would you need someone to come in and explain scientifically how the heroin was made or who produced it or whether this really was heroin if you had that kind of evidence? Well, in that example, they're actually selling the product. They're not alleging that we're in a lab here and we're making it and then taking it and selling it. It's one step beyond. They have what they believe is. No, if they say we had what we believed was heroin and we sold it, which we bought from somebody, they could be convicted of selling it. But if they said we had what we believed was heroin because we manufactured it from raw ingredients and sold it, they couldn't be convicted of manufacturing. It would all depend on what the evidence was that was produced to show that, in fact, it was produced. I think there has to be a certain indication of reliability, and it flies in the face of Daubert and Pomotire. I know I've run way over, but in any event, I would simply state that in a conclusion that the cumulative effect of that failure of testimony, together with the circumstantial evidence charge that was given, because the case is wholly circumstantial, and the very short deliberation and that my client received the longest sentence of all the co-conspirators, and he had a very small involvement, even if we accept all that evidence that was testified against him, that ultimately he was denied a fair trial, I'd ask that he be given a fair trial and send that back and overturn the fact that they didn't sufficiently prove the production of more than 50 grams. Thank you. Thank you. May it please the Court, Your Honor, my name is Lisa Gilles, and I'm here on behalf of Appellant Wanda Kingsley, and I do save one minute for rebuttal. I appreciate the opportunity to present my oral argument as well as the briefs I have submitted for your consideration, and I adopt the arguments set forth by Co-Counsel Cimino and ask that you consider them for Appellant Kingsley as well. The most pressing argument here, and I've seen after Mr. Cimino argued to the Court, is that the weight and how the government proved greater than 50 grams was bootstrapped through a witness who they claim is a lay witness and we submit was an expert witness. The federal rules of procedure, the federal court in its wisdom, requires the parties to complete a court-ordered questionnaire. It does that in order to allow the court and the parties to familiarize themselves with the facts of the case and the witnesses to be presented at trial. Part of that questionnaire requires the parties to list expert witnesses who may testify so that, if necessary, a Daubert hearing could be held ahead of time. I go back to a question that I asked your colleague, which is, was there any objection to this testimony on the ground that it was improper or undisclosed expert testimony at the trial? Well, I'm going to tell you why there wasn't. First of all, Timothy Peck testified before the government's primary investigator. Okay. We didn't know at that time whether or not—it sort of took us by surprise. We never had a Daubert hearing to determine whether or not that testimony could be expert, and it took us by surprise. But if you never had a Daubert hearing and somebody comes in and says, I'm a Ph.D. and I know how this thing works and I'm telling you this in my expert opinion, and you just let it slide by, how does the fact that you didn't have a Daubert hearing in advance make a difference? Isn't it incumbent on you to ask for a Daubert hearing then and move to exclude this testimony because it's improper? I agree with what you're saying, and I think my thinking was that maybe their case agent was going to expound upon what this person said. It took us by surprise. And so I agree with you. So let's just say, for argument's sake, that we committed an error. I don't believe we did, but let's just say we did because the government, sir, my, says that we are raising it for the first time in appeal and we raised it in trial court proceedings. They may have been post-verdict but pre-sentencing. The court has a gatekeeping function. I think it would have been incumbent upon the district— Their argument is that it's lay testimony. Now, that may — there's one question, is that correct or is it incorrect? There's a separate question of whether it's plain error that this was so clearly expert testimony rather than lay testimony that we should notice the error, notwithstanding that it wasn't brought to the attention of the court. Well, I think this court should notice the error and realize— and the plain error standard of review should be taken into account here. Why is it expert testimony? His testimony in substance is, I learned how to make meth. I did it many times. This is the yield rate, this is how much meth I would get from this amount of pseudoephedrine. Why is that not rationally based on his observations? Because I think that when you look at any drug case and how it is tried, whether it's the government or the people of the State of New York, when they're presenting their case at trial in order to prove that the — and I don't think Appellant Kingsley is not saying that there wasn't meth produced in this conspiracy, but if you're trying to prove weight, which is a huge element, I mean, after all, my client had no criminal record whatsoever, and by accepting Timothy Peck's testimony and his testimony alone, I feel that you need to have an expert. An expert has got to — But that is a different question. You could say it may have been late testimony, but I don't think it's sufficient to support a weight determination. I think that I'm agreeing with you, and I feel that it goes to the heart of the conviction of my client in that we had no basis. We, at that point, weren't expecting this person to testify. Well, of course, if we reversed the conviction for the B1B count on the ground that there was inadequate proof of 50 grams to prove that beyond a reasonable doubt, it would drop down to a B1C conviction. So they would still be convicted. I agree with you on this. And there would be a — no mandatory minimum. That's right. But the sentence that was given was higher than the mandatory minimum, so the mandatory minimum didn't affect that. And the sentence that was given is lower than the maximum that would apply to a B1C conviction. Are you saying that the evidence in the record is insufficient to support a finding by a preponderance of the evidence at the time of sentencing as to the drug quantity that the judge relied upon in calculating the guidelines? Yes, I am. And I do realize that the court gave my client a non-guideline sentence taking into all the 3553 considerations, but she probably would have gotten probation given her record had the jury not relied on this Timothy patent. The jury would be irrelevant at that point, right? The judge is selecting a sentence based on a — first calculating the sentencing guidelines, calculating the amount by a preponderance of the evidence, and then subsequently is considering all the 3553 factors to decide whether to give that sentence or a different sentence and came out to this particular sentence. Now, I suspect that if you're right, that the count of conviction is wrong, there would be a resentencing. So I'm not questioning that, and maybe that's good enough that you live to fight another day. I'm just trying to figure out whether this is actually helping anybody. Well, I don't mean to interrupt you, Your Honor, but living to another day, my client probably would have been released by now. She's been in custody four years, and I do think that this does go to the heart. The 50 grams, it goes to the heart. I don't mean to quote Woman in Gold either. But the judge found many more than 50 grams by a preponderance of the evidence, not just 50 grams. But you still – it's an element of the crime to have – somehow you have to have some expert testify about weight. So you just – Why do you have to have an expert testify? There are millions of cases that we have where the evidence of quantity is some notebook that somebody has where he says 50 kilos. There's no expert. There's a conspiracy, and there's evidence about how much drugs the conspirators trafficked in. Well, I don't think that was the case here, and I think the government called Timothy Peck for a specific purpose, and that was to testify about the number of pills it would have taken in order to produce this much meth. And I don't – I believe that if this is allowed to happen, you're opening a huge can of worms. That's what I'm saying. That if the government is allowed to prove weight in its cases by not having to call somebody to the stand who can say, these are the methods, this is the literature that we use when we come up with this, and based upon the number of pills in this conspiracy, this would have been the amount of methamphetamine produced based upon whatever scientific literature they're relying on, then I feel that the can of worms opens, and it shouldn't be opened in this case. I feel that this case should be sent back for some remedy, and whether it's resentencing on an amount less than 50 grams. The remedy would be reversal of the B1B conviction and substitution of a B1C conviction, and presumably that would entail the judge resentencing, and the judge would do what the judge does. I'm not sure it would be different, but it might be, than what the judge did the last time. So that's clearly the remedy that is entailed by your argument. I'm not disagreeing with you, Your Honor. I'm not disagreeing at all. Thank you. May it please the court. Rajiv Dosanjh for the government. I just wanted to talk a little bit about who Timothy Peck was. He started out as a smurfer for one of the co-conspirators here, buying pseudoephedrine. He then learned how to make meth through the shaking method, which is the same method that the person he was buying for was using, and the other main cook in this, Junior, was using. There's just ample testimony here that everyone involved was doing this to make meth. The co-conspirators are saying that's what we were doing, we were cooking up meth. Aren't yield rates from a chemical reaction, don't they vary depending upon what lab procedure is used? And more broadly than this specific method, the way a person uses the method will get a lower or higher yield rate. I would agree with that, Your Honor. I think even Mr. Peck acknowledges that it depends on also what you put in. Two methods lead to different results. But he has cooked many times using the shaking method. As a layperson, he's not doing this in the lab. He must have seen variables as well. His testimony is at least 50% would be produced by this amount. But he is not, and I'm a little confused by the argument. My thought was that, from reading their brief, that the claim was that he should have been qualified as an expert because he testified as one. It now seems also that they're saying that his testimony was not expert enough. But putting that aside, going to the first claim, he did not testify as an expert. He testified based on his own experience. He never got into the kind of mechanics of why this happens or how much is necessarily produced by a chemical reaction. He's not explaining the how and the why, which is what experts do. I'm thinking of kind of a comparable situation in the analyte drug context where you have to have experts explain the structure of a drug. You have to have experts who will explain the chemical reactions in the brain that produce a certain neurological effect, which is required, versus testimony of someone who uses the drug and said, well, this felt a lot like ecstasy. Mr. Pack is just testifying based on his experience. I don't think he's even rendering an opinion. He's saying this is what I got. How do we know that his lay experience provides an adequate basis to determine quantity in this case beyond a reasonable doubt? Well, again, because of the way he's related to these individuals, they're all using the same method. He learned the method from the same person from whom Mr. Ross's brother-in-law, who was the cook in this case, learned it. I think it's Mr. McGinnis that he was kind of smurfing for, and I think the testimony is that he learned to manufacture meth himself. I think he wanted to break away from just being a smurfer, but the testimony was that he's using the exact same method, which is the shaking bottle method. And again, I think because the quantities... If you use that method, it causes an explosion. That's right. And that would produce a different quantity of meth, presumably. So how do we know that given the variation in the amount of meth that would be produced by the way you use that method that we don't have to be worried about that in this case? Well, as Your Honor pointed out, I think if you look at the entire quantities involved here, they're much higher, the input, the pseudoephedrine input is much higher than even the quantities that Ross and Kingsley actually put in, which under a 50% yield rate would be about 80%. But here it would be way over, and as he's pointed out, I think it would be such a low yield rate that I think relying on Mr. Peck's testimony here is reasonable to suggest that it's got to be at least 50%. I would also point out that we're talking about a conspiracy charge here, so I think evidence of what actually came out, if it was slightly under 50% or slightly over, I think the intent here was a conspiracy to manufacture meth, and that involved 50%. So I think the agreement here was to try to produce meth, and the quantity itself is a different question, and I think the evidence does establish it was over 50 grams. Again, especially in light of taking all reasonable inferences in favor of the government, as we are now. Turning, I guess, I just want to talk about one other issue, which actually wasn't raised by the defendants, but the jury instruction issue. They've cited no case law, citing that it's a reversible error not to give the instruction that he requested. This was a sufficiency case, wasn't it? Just a straight sufficiency case? And whether if you have inferences can be drawn equally in a circumstantial evidence case, then you can't, the evidence is insufficient. Glenn was, I think, a case where I think someone just happened to be in a certain area where a drug transaction was happening, and whether that's enough to... I mean, here the bulk of the evidence was direct testimony, right? That's right, from co-conspirators who, and for the other charges especially, possession of pseudoephedrine with knowing, or the transfer of it, knowing that it would be used for methamphetamine. But the entire case had a lot of direct evidence from co-conspirators who saw individuals cooking, saw Mr. Ross cooking at least 20 times. So the judge, as far as circumstantial evidence, just gave this judicial circumstantial evidence charge, this standard one in sand? That's right. And it makes very clear that if you are wavering at all, if this is a matter that you would hesitate to act on in a matter of importance to you, you cannot find a reasonable doubt here. I think it conveyed very clearly if the evidence is an equipoise, then you can't convict. The instruction they were seeking went further than what we said in Glenn and other cases, which is in evaluating the case as a whole in the Rule 29 context. That's right. They were asking for an instruction that went to how to evaluate the quantum of proof with regard to each element of the crime. That's true. An entirely different thing. Yes, Your Honor. Just going back also to the quantity issue, I would also point out that there's testimony here that one cook, McGinnis, who is not even talking about Junior, the other main cook, cooked up meth about 80 times. And it could be even higher than that, but it was about 60 to 80 times was the testimony. And Junior was equally active here. So we're talking about many, many cooks going on. And, again, this gets to the idea that the quantities involved, the inputs being put in, you would have to go so far down and infer against Mr. Peck's testimony to find a reversible error here based on the standard of review that we're under. The sentencing issues, Your Honor, I would address in our brief. And if there's no other questions, I'll just rest on our arguments. Thank you. Busy week for you down here, Mr. Dessange. Yes. All right. Thank you. Just briefly, going back to what I said, whether or not the Coleman method produced methamphetamine and how much it produced was, in this particular case, wholly circumstantial based on what was presented. You can talk about we went and bought the batteries we want and had the empty Mountain Dew bottles and whatever. But then to come to the end of the journey here and say that the Coleman method produces meth and how much it produces, there's no other way to characterize what Timothy Peck had to say. The fact that, although he was a lay witness, is that he was speaking about yield. And what other conclusion can we come to that yield is a scientific end? Thank you. And what I have to say is basically the same thing, Your Honors. When you're talking about yield and you're talking about a number, and that number is significant when it comes to sentencing in a case such as this, I believe that is incumbent upon the government. Just call an expert. Call somebody who is going to testify about yield rates. Talk about the scientific reliability of cooking methods. Talk about this method that we heard evidence about at trial as compared to maybe other methods. And make it so the jury understands the importance and the necessity of what they're trying to come to a conclusion about. Just to assume because there's an overwhelming amount of meth that's produced during this conspiracy that without that testimony they would have come to the conclusion that it was over 50 grams. I don't think so after sitting through and trying this case. I don't believe that's the case. I believe that they relied heavily on Mr. Peck's testimony. And without it, they very easily and most likely the outcome would have been different. They would have come to the conclusion that it was under 50 grams. And my client most likely, given her criminal record, would have been placed on probation at that point. Thank you. Thank you all. We'll take the matter under submission.